2010 VT 92

# Northern Security Insurance Company, Inc. v. Susan Durenleau Stanhope, Jesse Durenleau, Helene Parah and Augustin Parah, Jr.

[14 A.3d 257]

No. 09-078

Present: Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.

Opinion Filed October 8, 2010

*Gregory S. Clayton* and *Jeffrey S. Marlin* of *Primmer, Piper, Eggleston & Cramer, P.C.*, Montpelier, for Plaintiff-Appellant.

*William T. Counos, II* and *Vanessa B. Kittell* of *Kissane Associates*, St. Albans, for Defendants-Appellees.

¶ 1. **Burgess, J.** The plaintiff in this declaratory judgment action, Northern Security Insurance Company (Northern), appeals from a superior court judgment that it owes a duty of coverage to Rose, Steven, and Kyle Perron, its insureds under a homeowner's policy. Northern contends the trial court erred in ruling that: (1) Rose Perron's misrepresentation did not void coverage of Steven and Kyle; (2) Northern had the burden to prove that injury to the third-party complainants was intended or expected; (3) intent to injure is governed by a subjective standard; and (4) a statement by Northern's attorney during rebuttal argument was objectionable. We affirm.

¶ 2. This appeal represents the latest round in a lengthy and ongoing dispute arising from allegations of sexual abuse at a day care center in St. Albans, Vermont. Many of the relevant facts are set forth in the parties' first appeal, *Northern Sec. Ins. Co. v. Perron*, 172 Vt. 204, 777 A.2d 151 (2001) (*Northern I*), and may be summarized as follows. Between 1984 and 1995, Rose Perron ran a day care business from her home. Her clients included two children of the Dubes. In 1996, the Dubes filed suit against Rose, her husband Steven, and their son Kyle alleging that, between May 1991 and May 1995, Kyle (who was then between eight and eleven years old) had repeatedly sexually abused the Dube children. Two additional lawsuits by the Durenleau and Parah families followed, both alleging that Kyle had physically, sexually,

and emotionally assaulted their children when they were invited to play at the Perrons' house. Both the Durenleau and Parah suits alleged negligent supervision against Rose and Steven, and sexual assault, false imprisonment, intentional infliction of emotional distress, and negligence against Kyle.

¶ 3. In response to the complaints, Northern — the Perrons' homeowner's insurance carrier — filed a declaratory judgment action, seeking a ruling that its policy covered none of the complaints.[1] The trial court ultimately granted summary judgment in favor of Northern. The court ruled that coverage of the Dube complaint was precluded by the policy's business-pursuits exclusion, and that coverage of the Durenleau and Parah complaints was barred because the injuries inflicted by Kyle were not accidental or unexpected. In its ruling, the court applied the so-called "inferred intent" rule to conclusively presume an intent to harm from the sexual assaults themselves. *Northern I*, 172 Vt. at 214, 777 A.2d at 161. On appeal, we affirmed the judgment as to the Dubes, but reversed as to the Durenleaus and Parahs, holding that the inferred intent rule was inapplicable to minors. *Id.* at 226, 777 A.2d at 167. Accordingly, we remanded the case to the trial court for a factual determination on whether Kyle intended or expected injury to occur, as well as a ruling on Northern's additional claim that coverage was voided by Rose Perron's alleged misrepresentations in her policy application. *Id.* at 218, 226, 777 A.2d at 161, 167.

¶ 4. Following our remand, Northern filed a second motion for summary judgment, asserting that the policy was void because Rose Perron had falsely stated in the policy application that no business pursuits were conducted on the premises. Northern relied on 8 V.S.A. § 4205 and the policy exclusion for fraud and misrepresentation.[2] The trial court issued a written ruling in September 2005, finding that Rose's statement constituted a

---

[1] The complaints against the Perrons were stayed pending resolution of the declaratory judgment action.

[2] The statute provides: "The falsity of a statement in the application for a policy covered by such provisions shall not bar the right to recovery thereunder unless such false statement was made with actual intent to deceive or unless it materially affected either the acceptance of the risk or the hazard assumed by the insurer." 8 V.S.A. § 4205. The policy exclusion states: "We do not provide coverage for an insured who, whether before of after a loss, has: (a) intentionally concealed or misrepresented any material fact or circumstance; (b) engaged in fraudulent conduct; or (c) made false statements; relating to this insurance."

material misrepresentation on which Northern had relied in issuing the policy, and that the policy was therefore void as to Rose. The court further found, however, that there was no evidence that the other insureds had any knowledge of the misrepresentation, and that they were therefore entitled to coverage under the "innocent co-insured" doctrine.

¶ 5. Shortly before trial on the question of Kyle's intent, the court issued a written ruling on the burden of proof, concluding that Northern had the burden of proving that coverage was barred under the policy exclusion for injury "which is expected or intended by the insured." A jury trial was held over the course of two days in January 2009. Kyle's two young victims testified, as well as a mental health expert for each side. At the conclusion of the trial, the jury returned a special verdict, finding that Kyle did not intend or expect to cause harm to either child when he molested them. Accordingly, the trial court entered judgment for defendants on the issue of coverage. This appeal followed.

I.

¶ 6. Northern first contends the trial court erred in applying the innocent co-insured doctrine to hold that Rose Perron's misrepresentation did not void coverage for Steven or Kyle. The court found that our decision in *Fireman's Fund Insurance Co. v. Knutsen*, 132 Vt. 383, 324 A.2d 223 (1974), was controlling. There, as here, a co-insured's spouse had misrepresented certain material facts in applying for a policy. Relying on the general rule that "an innocent co-insured may take under an insurance policy despite fraud committed by the other co-insured," that the policy expressly "applie[d] separately to each insured against whom claim is made or suit is brought," and that the co-insured was unaware of the facts upon which the representations were made, we held in *Knutsen* that the trial court erred in voiding the policy as to the innocent spouse. *Id.* at 396, 324 A.2d at 232. In this case, Steven too was unaware that his co-insured spouse had made false statements in procuring the policy, and the policy also expressly stated that it "applies separately to each insured."

¶ 7. Northern maintains, for several reasons, that *Knutsen* does not control. It seeks first to distinguish the decision on which *Knutsen* relied, *Mercantile Trust Co. v. New York Underwriters Ins. Co.*, on the ground that the policy there provided that it was

void "in case of any fraud or false swearing by *the* insured relating thereto," 376 F.2d 502, 504 (7th Cir. 1967) (emphasis added), while the policy here voids coverage "for *an* insured who has . . . intentionally concealed or misrepresented any material fact or circumstance." This argument was not clearly and specifically raised with the trial court, however, and therefore was not preserved for review on appeal. See *Progressive Ins. Co. v. Brown*, 2008 VT 103, ¶ 6, 184 Vt. 388, 966 A.2d 666 (to raise an argument on appeal "an appellant must properly preserve it by presenting it to the trial court with specificity and clarity") (quotation omitted). Moreover, *Mercantile* did not rely on the particular language of the fraud exclusion at issue, but rather on the fact that the innocent co-insured "had no control over the property and was unaware of [the co-insured's] misconduct." 376 F.2d at 506. Nor in relying on *Mercantile* did *Knutsen* even refer to the particular language of the fraud exclusion at issue there, resting its decision solely on the considerations underlying the innocent co-insured doctrine. Accordingly, Northern's attempt to distinguish *Knutsen* is unpersuasive.

¶ 8. Northern also asserts that *Knutsen* "conflicts" with our subsequent decision in *Cooperative Fire Insurance Ass'n v. Domina*, 137 Vt. 3, 399 A.2d 502 (1979). *Domina* held that a co-insured spouse could not recover under a fire insurance policy where the property was willfully destroyed by the other co-insured spouse and the parties held the property as tenants by the entirety with "indivisible" interests. *Id.* at 5, 399 A.2d at 503. We have since explained that *Domina* was predicated upon the peculiar "nature of a tenancy by the entirety" and have reaffirmed the general rule permitting recovery by an innocent co-insured in other circumstances. *Stankiewicz v. Estate of LaRose*, 151 Vt. 453, 455, 561 A.2d 400, 402 (1989) (refusing to apply *Domina* to toll insurer's fraud claim against innocent co-insured based upon fraudulent concealment by her spouse). Finally, Northern argues that *Knutsen* is distinguishable because it involved automobile insurance, where coverage is required by law and favored by public policy. Our holding in *Knutsen* was not predicated upon the particular nature of the policy at issue, however, and Northern has adduced no persuasive argument or authority to distinguish it on that ground. Accordingly, we conclude that the trial court did not err in applying the innocent co-insured doctrine to preserve coverage for Steven and Kyle.

¶ 9. *Knutsen* notwithstanding, Northern also claims that the plain and unambiguous language of the fraud exclusion at issue here bars recovery by innocent co-insureds. Northern relies on decisions from other jurisdictions holding that policies which void coverage for fraud or misrepresentation committed by "*an* insured" or "*any* insured" operate to bar coverage for all insureds even if they are innocent of any fraud or misrepresentation. See, e.g., *Watson v. United Servs. Auto. Ass'n*, 566 N.W.2d 683, 689 (Minn. 1997) ("We conclude that the 'an insured' language of [the] policy unambiguously bars coverage for innocent co-insured spouses."); accord *Watts v. Farmers Ins. Exchange*, 120 Cal. Rptr. 2d 694, 704 (Ct. App. 2002); *Trinity Universal Ins. Co. v. Kirsling*, 73 P.3d 102, 105 (Idaho 2003). Northern notes that we reached a similar conclusion in *Northern I* with respect to the intentional-harm exclusion, explaining that, when the policy "uses the article 'the,' the provision applies only to claims brought against the particular insured named in the claim," while "[c]onversely, when the exclusionary language refers to intentional acts of '*an* insured,' courts have uniformly concluded that the exclusion applies to all claims which arise from the intentional acts of any one insured." 172 Vt. at 220, 777 A.2d at 163. Whatever the argument's merits, however, it was not clearly and specifically raised below and therefore was not preserved for review on appeal. *Brown*, 2008 VT 103, ¶ 6. Although the innocent co-insured issue was fully litigated, Northern did not claim that the specific language of defendants' homeowners' policy barred recovery by an innocent co-insured. Accordingly, we decline to address the issue.[3]

## II.

¶ 10. Northern next contends the trial court erroneously instructed the jury on the policy exclusion for injuries "intended or expected by the insured." Northern raises two points in this regard. First, it asserts that the trial court erred in declining to

---

[3] We note, however, that the policy does not, as Northern maintains, "provide[] that there will be no coverage in the event 'an insured' makes misrepresentations relating to the insurance before or after a loss." Instead, the policy states: "We do not provide coverage for an insured who, whether before or after the loss, has . . . intentionally concealed or misrepresented any material fact or circumstance." Although we do not decide the issue, we observe that the policy language could be construed to refer to the conduct of the specific insured who committed the fraud or misrepresentation, rather than the fraudulent act of any insured.

allocate to defendants the initial burden of proving an occurrence, defined under the policy as "an accident" resulting in bodily injury or property damage.[4] Because the insured generally bears the burden of establishing coverage in the first instance, and we have previously defined "accident" as an "unexpected happening without intention and design," *City of Burlington v. Nat'l Union Fire Ins. Co.*, 163 Vt. 124, 128, 655 A.2d 719, 721 (1994) (quotation omitted), Northern essentially argues that defendants here should have been required to come forward with evidence that the injuries were not expected or intended. We considered and rejected the same claim in *State v. CNA Insurance Cos.*, 172 Vt. 318, 331, 779 A.2d 662, 672 (2001), where we interpreted identical policy provisions to hold that, once the insured has made out "a prima facie case for coverage by producing evidence of the harm," the burden is on the insurer to rebut that case by "prov[ing] that the harm was intended or expected." This was essential, we explained, to preclude the insured from being "left with proving a negative," *id.* at 330, 779 A.2d at 672, and to place the burden of proof on the party with the most resources and "incentive" to develop the issue. *Id.* at 331, 779 A.2d at 672.

¶ 11. Although not entirely uniform, many decisions from other jurisdictions are to the same effect. See, e.g., *Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1205 (2d Cir. 1995) (applying New York law to hold that the "exclusionary effect of policy language . . . controls" and that the insurer had the burden to prove that the harm was expected or intended despite the policy definition of "occurrence" as an accident resulting in harm "neither expected nor intended"); *Fireman's Fund Ins. Cos. v. Ex-Cell-O Corp.*, 750 F. Supp. 1340, 1350 (E.D. Mich. 1990) (assigning burden of proof regarding "neither expected nor intended" clause in definition of occurrence to the insurer, noting that "[t]his interpretation is supported by case law and the general rule . . . that an insurer must prove the applicability of an exclusion to coverage"); *Carter-Wallace, Inc. v. Admiral Ins.*

---

[4] Northern also asserts, in a footnote, that the policy's definition of occurrence was subsequently deleted, leaving the term undefined. This point was not clearly and specifically raised below, and we thus assumed in *Northern I* — as we do here — that the policy's definition of "occurrence" as "an accident" resulting in personal injury remained in effect. 172 Vt. at 209, 777 A.2d at 155. Even if Northern were correct, moreover, we fail to see how its position is advanced by claiming that defendants must establish coverage under a policy provision that has no definition.

*Co.*, 712 A.2d 1116, 1126 (N.J. 1998) (holding that the "unexpectedly and unintentionally" definition of occurrence "should be treated as an exclusion for purposes of assigning the burden of proof" to the insurer). Accordingly, we find no error in the trial court's decision to place the burden of proof on Northern to establish that the harm was "intended or expected" under the policy exclusion.

¶ 12. Northern also claims that the trial court erred in rejecting its request for an instruction on the intentional-harm exclusion that would have incorporated an objective rather than a subjective standard. The trial court had propounded an instruction explaining that "[w]hen we say expected in this context, what we mean is this: Did Kyle know . . . that his sexual actions would harm Jesse and/or Gus." Northern proposed modifying the instruction to state as follows: "Did Kyle know *or have reason to know* that his actions" would cause harm. (Emphasis added.) The trial court rejected the request as inconsistent with our decision in *Northern I* and settled case law.

 ¶ 13. The trial court's ruling was correct. As we observed in *Northern I*, " '[a]ssuming the wrongdoer *subjectively* intends or expects to cause some sort of injury, that intent will generally preclude coverage.' " 172 Vt. at 211, 777 A.2d at 156 (quoting *SL Indus., Inc. v. Am. Motorists Ins. Co.*, 607 A.2d 1266, 1278 (N.J. 1992) (emphasis added)). We further explained that " '[a]n insured expects an injury if he or she is *subjectively aware* that injury is substantially certain to result.' " *Id.* at 213-14, 777 A.2d at 158 (quoting *Espinet v. Horvath*, 157 Vt. 257, 262, 597 A.2d 307, 310 (1991) (Allen, C.J., dissenting) (emphasis added)). Consistent with this understanding of the exclusion, we directed the trial court on remand to "determine[], based on the particular characteristics and experience of the minor," whether he intended to injure by his actions. *Id.* at 218, 777 A.2d at 161.

 ¶ 14. Of course, the precise question in *Northern I* was not whether a subjective or objective standard applied under the exclusion, but rather whether the inferred-intent rule should apply to conclusively presume an intent or expectation of harm in cases of sexual abuse committed by a minor. Nevertheless, as noted, we assumed that a subjective standard applied, and that assumption was well grounded in the law. Indeed, in *Horvath* we interpreted the identical exclusion for "bodily injury . . . which is expected or

intended by an insured" to hold that the trial court had improperly inferred an intent to harm as a matter of law based on the insured's "inherently dangerous activities." 157 Vt. at 259-60, 597 A.2d at 308-09. As we explained, the trial court had correctly "acknowledged that, under Vermont law, whether [the insured] expected or intended the injuries is a *subjective inquiry*" but had nevertheless improperly applied "an objective standard" for inherently dangerous activities where no such language or purpose could be gleaned from the policy language. *Id.* at 259, 597 A.2d at 309 (emphasis added).

¶ 15. Chief Justice Allen wrote separately in *Horvath*, not to disagree with this conclusion, but to clarify that "[a]lthough the inquiries into an insured's intentions and expectations under the terms of the policy [exclusion] *are both subjective*, they are not identical." *Id.* at 261, 597 A.2d at 310 (Allen, C.J., dissenting) (emphasis added). He went on to explain that "[a]n insured intends an injury if he or she *subjectively* desires it, and an insured expects an injury if he or she is *subjectively aware* that injury is substantially certain to result." *Id.* at 262, 597 A.2d at 310 (emphasis added). More recently, in holding that the inferred-intent rule applies to claims of sexual harassment as well as sexual assault, we reaffirmed the principle that "[a]n insured expects an injury if he or she is *subjectively* aware that injury is substantially certain to result." *Serecky v. Nat'l Grange Mut. Ins.*, 2004 VT 63, ¶ 19, 177 Vt. 58, 857 A.2d 775 (quotation omitted) (emphasis added).

¶ 16. This interpretation of the standard intentional-harm exclusion is consistent with that of commentators and cases nationwide. Thus, a leading insurance authority observes that under the exclusion "one must look to the *subjective intent of the insured*" except in special cases where, because the insured is so young, mentally incompetent or intoxicated "as to negate the requisite subjective intent" the exclusion may not apply. 2 A. Windt, Insurance Claims and Disputes § 11:9 (5th ed. 2007) (emphasis added). Another standard treatise notes the "many courts hold[ing] that the term 'intent' requires that the insured *consciously* desires the result of his or her act and the term 'expect' requires that the insured *knows* with substantial certainty that loss or damage will follow from his or her conduct regardless of his or her desire." 16 E. Holmes, Holmes' Appleman on Insurance 2d § 118.2, at 437-38 (2000) (emphasis added).

¶ 17. Out-of-state cases interpreting the exclusion to the same effect are also widespread and numerous. See, e.g., *Jackson v. State Farm Fire & Cas. Co.*, 661 So. 2d 232, 233 (Ala. 1995) (reaffirming rule that "a purely subjective standard governs the determination of whether the insured expected or intended the injury") (quotation omitted); *Armstrong World Indus., Inc. v. Aetna Cas. & Sur. Co.*, 52 Cal. Rptr. 2d 690, 719 (Ct. App. 1996) (rejecting an "objective (should have known) standard" in favor of what the insured "*actually* knew or believed"); *Vermont Mut. Ins. Co. v. Walukiewicz*, 966 A.2d 672, 681 (Conn. 2009) (holding that the exclusion "is triggered when the insured subjectively expects or intends that bodily injury will occur"); *Meridian Ins. Co. v. Zepeda*, 734 N.E.2d 1126, 1130 (Ind. Ct. App. 2000) ("An injury is expected if the insured was consciously aware that the injury was practically certain to occur."); *James Graham Brown Foundation, Inc. v. St. Paul Fire & Marine Ins. Co.*, 814 S.W.2d 273, 278 (Ky. 1991) ("The 'expected or intended' exception is inapplicable unless the insured specifically and subjectively intends the injury giving rise to the claim."); *Great American Ins. Co. v. Gaspard*, 608 So. 2d 981, 985 (La. 1992) (noting that "[t]he subjective intent of the insured . . . will determine whether an act is intentional"); *Maine Mut. Fire Ins. Co. v. Gervais*, 1998 ME 197, ¶ 11, 715 A.2d 938 (holding that the standard policy exclusion of injuries expected or intended by the insured "refers only to bodily injury that the insured in fact subjectively wanted ('intended') to be a result of his conduct or in fact subjectively foresaw as practically certain ('expected') to be a result of his conduct") (quotations omitted); *Auto-Owners Ins. Co. v. Harrington*, 565 N.W.2d 839, 842 (Mich. 1997) (affirming lower court holding that the exclusion "requires a subjective inquiry into the intent *or expectation* of the insured"); *Cameron Mut. Ins. Co. v. Moll*, 50 S.W.3d 329, 333 (Mo. Ct. App. 2001) ("a subjective standard must be used for determining whether the injuries were expected or intended"); *McCoy v. Coker*, 620 S.E.2d 691, 695 (N.C. Ct. App. 2005) (in determining whether the injury was expected or intended by the insured "[t]he test should be a subjective one, from the standpoint of the insured, and not an objective one asking whether the insured should have expected the resulting damage") (quotation omitted); *Farmers & Mechs. Mut. Ins. Co. of W. Va. v. Cook*, 557 S.E.2d 801, 807 (W.Va. 2001) ("under the intentional [injury] exclusion, courts generally look to the subjective intent of the policyholder").

¶ 18. In reaching this conclusion, courts have generally relied on the plain language of the standard exclusionary clause which, as here, typically bars coverage of an injury intended or expected *by the insured* rather than by a *reasonable person* in the position of the insured, together with the general principle that exclusions must be construed in favor of coverage. See, e.g., *Walukiewicz*, 966 A.2d at 680-81 (holding that "the inclusion of the phrase 'by the insured,' indicates that its application is triggered when the insured subjectively expects or intends that bodily injury will occur, and not merely when an ordinary, reasonable person would be able to foresee injury occurring as a result of his acts"); *Brown*, 814 S.W.2d at 279 (noting that the policy did not exclude harm expected or intended "from the standpoint of a reasonable person"); *Auto-Owners Ins. Co. v. Harrington*, 538 N.W.2d 106, 109 (Mich. Ct. App. 1995) (holding that the policy language "expected or intended by an insured person" is unambiguous and requires a subjective intent on behalf of the insured), *aff'd*, 565 N.W.2d 839 (Mich. 1997); *Cook*, 557 S.E.2d at 807 (observing that "the policy language specifically says to determine if the loss was 'expected or intended *by the insured*,'" from which "it is apparent that courts should not examine an intentional exclusion with an 'objective' standard in mind" but whether "this policyholder expect[ed] or intended[ed] the injury"). For this reason, courts have generally recognized that the usual "presumption in tort and criminal law that a person intends the natural and probable consequences of his intentional acts has no application" in construing the terms of the usual intentional-harm exclusion, which incorporates a "purely subjective standard." *Jackson*, 661 So. 2d at 233 (quotations omitted); see also *Walukiewicz*, 966 A.2d at 681 n.18 ("Determining whether an insured acts intentionally for purposes of insurance law is different than for purposes of tort law because there is no presumption in insurance law that a person intends the ordinary consequences of his actions.") (quotation omitted).

¶ 19. Courts have also reasoned that an objective "should have known or expected" standard would deny coverage for injuries negligently or foreseeably caused, rather than intended, and thereby defeat the very risk for which the insured contracted. See, e.g., *Shell Oil Co. v. Winterthur Swiss Ins. Co.*, 15 Cal. Rptr. 2d 815, 833, 836 (Ct. App. 1993) (rejecting jury instruction providing that "the exclusionary word 'expected' denotes that the

actor knew or should have known that there was a substantial probability" of harm, explaining that what the insured "should have known . . . invited denial of coverage for conduct within the realm of negligence"); *United Servs. Auto. Ass'n v. Elitzky*, 517 A.2d 982, 991 (Pa. 1986) (rejecting objective standard based on concern that "an exclusion of injuries the insured 'should have anticipated' might exclude from coverage, not only intentional injuries but also those caused by negligence"); *Queen City Farms, Inc. v. Cent. Nat'l Ins. Co.*, 882 P.2d 703, 713 (Wash. 1994) (holding that an objective standard to determine whether the injury was intended or expected would be "inconsistent with insurance coverage for damage resulting from ordinary negligence").

 ██ ¶ 20. Thus, consistent with the foregoing reasoning and the weight of decisional authority — our own as well as others — we conclude that the trial court here correctly rejected Northern's proffered instruction. Of course, our conclusion that a subjective standard governs whether a minor in these circumstances intended or expected harm to result has no impact on our earlier decisions holding that, when the perpetrator of the sexual assault or harassment is an adult, such intent must be inferred.

 ¶ 21. Nor is this to hold that an insured's subjective intent to harm, or subjective understanding that harm was practically certain to result, must be deduced solely from the insured's own statements or admissions regarding his or her state of mind. On the contrary, as a leading insurance commentator explains, "the insured's awareness must be measured subjectively, even if the proof must be constructed from circumstantial evidence out of which the inference of subjective intent is made." 16 E. Holmes, Holmes' Appleman on Insurance § 118.2, at 454; see also *Cameron Mut. Ins. Co.*, 50 S.W.3d at 333 ("Even when the subjective approach is used, an insured's subjective intent to cause injury can still be inferred from the nature and circumstances of the insured's intentional acts."). Indeed, as we explained in *Northern I*, in determining whether a minor such as Kyle intended or expected his or her actions to injure, "the trier of fact should examine the facts and circumstances of the case before it, including the circumstances surrounding the sexual conduct, as well as the minor's age, ability, intelligence, and experience." 172 Vt. at 218, 777 A.2d at 161 (quotation omitted).

¶ 22. Northern claims that, notwithstanding our directions, the trial court here misled the jury to believe that it could *not* consider the totality of the facts and circumstances surrounding the sexual assaults in determining whether Kyle intended or expected to cause injury. The record does not support the claim. Consistent with our holding in *Northern I*, the trial court here instructed the jury that, in determining whether Kyle expected or intended to cause harm to the victims, "you may consider *all* relevant evidence." (Emphasis added.) The court explained that such evidence could "include Kyle's age, abilities, intelligence and experience at the relevant time, as well as the circumstances of the conduct itself." As to the evidence of Kyle's nonsexual threats and assaults, the court also instructed that, while not the basis of the underlying claims in this case, the jury could "consider the other incidents if it helps you to decide what Kyle intended or expected when he engage[d] in the sexual conduct."

¶ 23. Despite these clear instructions, Northern asserts that the jury was misled when the court sustained defense counsel's objection to a statement by Northern's attorney during his rebuttal argument. Prior to the objection, Northern's attorney had argued as follows:

> [Defense counsel] says that it's just speculation that Kyle Perron intended to harm his clients. Just speculation. There's no evidence that the actual acts were harmful. I think he said that there's no evidence that any of the injuries to any of the victims were harmful. [¶] Well, let's talk about common sense if an eleven year old boy is vaginally penetrating a four year old girl. Are we saying that's not harmful? That's not injurious? If an eleven year old boy is raping his brother, that's not harmful? That's not injurious? This is not some five year old kid. This is an eleven year old who is sexually mature, who's got sexual experience. He knows what he's doing. [¶] The injury here, Kyle doesn't have to anticipate that these folks are going to have psychological problems. All he had to know is that what he's doing is harmful. Harmful to them. And how does he know that? He knows that because these kids said, "No." This was not consensual sex. This was forced sex and that, alone, is the injury.

¶ 24. Defense counsel objected on the ground that Northern's attorney was "suggesting that Kyle just needs to know. It's about

intent." At the ensuing bench conference, defense counsel argued that knowledge was "not the standard . . . [Kyle] needs to either intend or expect." The court then questioned Northern's attorney as to the evidentiary basis of his argument that Kyle knew the acts were harmful, and counsel responded that defendants' expert had acknowledged that "non-consensual sex is harmful," observing that "if you're raping someone, that is harmful conduct." The court responded, "[w]ell . . . that's a totally different question from what we have here. So, I'll ask you to move on." The bench conference concluded and the court directed the jury to "disregard that last comment."

¶ 25. Northern asserts that the trial court erred in preventing it from arguing that intent to harm could be inferred from all of the evidence surrounding the assaults indicating that Kyle knew the assaults were nonconsensual and hurtful to the victims. The claim is unpersuasive. Whatever the court meant when it instructed the jury to "disregard that last comment," it plainly did not prevent Northern from arguing that Kyle's intent to harm could be inferred from all of the surrounding facts and circumstances, including "the circumstances of the conduct itself." Northern's attorney argued extensively and without objection that Kyle's intent to harm could be inferred from the evidence showing that he was "capable" and "willing to use violence" to achieve his ends, "that he knew how to hurt [the victim] and he proved that he would hurt [the victim]" to achieve "compliance" and "coerce sex." Indeed, counsel argued that the key to understanding Kyle's state of mind was to focus on the coercive nature of the "non-consensual sex." Counsel argued by analogy that "if a woman is raped . . . that's a violent and harmful act and there's an intention to harm . . . [a]nd it's the same thing for a child victim." Counsel asserted that "harm and hurt was in the front of [Kyle's] mind," concluding that "[h]e knew what he was doing was wrong and was hurtful and was not consensual."

¶ 26. Consistent with the trial court's instructions, Northern's attorney argued repeatedly that intent to harm was evident from all of the circumstances surrounding the assaults. This included the "pattern" of Kyle's behavior which revealed "a sophisticated sexual predator" and "serial rapist" who — despite his relatively young age — planned his assaults, repeatedly used "violence and threats of violence to get what he wanted," and escalated his use of force, aggression, and cruelty when his victims resisted. It was

this pattern of behavior, according to counsel, these "pieces [that] when you put them together, with the threats and the intimidation and the imbalance of power, that tells you that . . . these actions . . . were intended to cause harm."

¶ 27. We thus find no support for the claim that the jury was misinformed or that Northern was improperly prevented from arguing that intent to harm could be inferred from all of the surrounding facts and circumstances, including evidence that Kyle knew the assaults were harmful and nonconsensual. If the jury was ultimately unpersuaded by the argument, it was not the result of trial court error.[5] Accordingly, we find no basis to disturb the judgment.

*Affirmed.*

---

[5] Defendants introduced substantial countervailing evidence on the issue of intent in the form of expert testimony by a clinical psychologist who had evaluated Kyle and his young victims and concluded that Kyle "did not intend or expect that [his] actions would harm" the victims. The expert testified that the minor's striking lack of insight or remorse suggested an absence of understanding that his actions were harmful; that Kyle's own history of being sexually abused "could have conveyed to him the idea that this was an acceptable activity to engage in"; that Kyle's understanding of the prohibited nature of his conduct did not reveal an "additional understanding" about its harmful effects; and that ultimately Kyle's intent in perpetrating the sexual assaults, including his use of force, was not to harm but to satisfy his own curiosity and "desire for sexual gratification."