2011 VT 108

### Bradford Oil Company, Inc. v. Stonington Insurance Company and State of Vermont Agency of Natural Resources

[___ A.3d ___]

No. 10-361

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed September 9, 2011

*William H. Sorrell*, Attorney General, and *Nicholas F. Persampieri* and *Scot L. Kline*, Assistant Attorneys General, Montpelier, for Defendant-Appellant.

*Bret P. Powell* of *Powell Orr & Bredice PLC*, Williston, for Defendant-Appellee Stonington Insurance Company.

¶ 1. **Dooley, J.** This case considers who should bear responsibility for the cost of cleaning up petroleum contamination caused

by releases from a gas station's underground storage tanks. The controversy in this appeal is between the State of Vermont, which runs the Vermont Petroleum Cleanup Fund (VPCF) and Stonington Insurance Co. (Stonington), which insured Bradford Oil, the owner of the underground storage tanks, for approximately a three-and-a-half-year period. The State appeals from the trial court's judgment limiting Stonington's liability to a 4/27 share of past and future cleanup costs and awarding the State $45,172.05. On appeal, the State argues: (1) this Court's application of time-on-the-risk allocation in *Towns v. Northern Security Insurance Co.*, 2008 VT 98, 184 Vt. 322, 964 A.2d 1150, does not preclude joint and several liability under all standard occurrence-based policy language; (2) the circumstances here, including the reasonable expectations of the insured and the equity and policy considerations, support imposing joint and several liability on Stonington for all of the State's VPCF expenditures; and (3) even if time-on-the-risk allocation would otherwise be appropriate, Stonington is not entitled to such allocation because it has failed to show sufficient facts to apply this allocation method in the present case. We conclude that *Towns* does control here, and we are unconvinced by the State's reasonable expectations, equity, and policy arguments to distinguish this recent decision. Accordingly, we affirm.

¶ 2. Plaintiff Bradford Oil Company, Inc. (Bradford) owns a Mobil station in St. Johnsbury that is the site of the petroleum contamination at issue. According to the parties' experts, the contamination may have begun as early as the 1960s or as late as the end of the 1970s. The Agency of Natural Resources (ANR) placed the site on the Vermont Hazardous Waste Sites List when, in April 1997, petroleum contamination was discovered following the removal of three underground storage tanks. In recent years, at the State's direction, Bradford has been paying to investigate and clean up the contamination, and the VPCF has reimbursed most of Bradford's expenses. Bradford initiated this case in 2006 to establish coverage for its cleanup liability under four commercial general liability policies from Stonington. The State cross-claimed seeking reimbursement to the VPCF from Stonington under the same policies. The coverage periods for the policies at issue began on July 18, 1994, and continued through December 1, 1997.

¶ 3. Initially, Stonington denied that its policies provided any coverage for the contamination damage on Bradford's property,

but it eventually stipulated to the existence of coverage, leaving only the allocation of costs and damages before the trial court. The allocation question arises because the coverage periods of Bradford's Stonington policies cover only a portion of the total time that contamination was allegedly occurring and that other policies might have been triggered, if any others existed.[1]

¶ 4. Stonington filed a motion for partial summary judgment in October 2009, asserting that a simple time-on-the-risk allocation method should apply in this case and that the company should be held liable for damages only in proportion to the time it assumed the risk of loss. Under a time-on-the-risk allocation or "pro-ration by years" method, each triggered policy bears responsibility for damages in proportion to the time it was "on the risk," relative to the total time of triggered coverage. *Towns*, 2008 VT 98, ¶ 33 (quotation omitted). Stonington argued that the trial court should follow this Court's decision in *Towns*, where we held that a simple time-on-the-risk allocation method was appropriate based on standard occurrence-based insurance policy language in the context of slowly occurring environmental contamination. The Washington Superior Court, Civil Division, agreed that *Towns* controls this case. The court granted Stonington's motion for summary judgment as to the method of risk allocation, but found that it could not determine Stonington's actual total liability on summary judgment because the proportion of time for which Stonington was responsible was still in dispute. Following summary judgment, in response to the remaining issues of fact identified by the trial court, the parties submitted a joint statement of facts not in dispute. Based on these undisputed facts and the earlier summary judgment decision, the trial court issued a judgment in August 2010 decreeing that Stonington's liability under its four insurance policies is limited to a 4/27 share of past and future cleanup costs and awarding the State $45,172.05 from Stonington for reimbursement of the VPCF expenditures and interest on the expenditures. This appeal followed.

¶ 5. This Court reviews a grant of summary judgment de novo, applying the same standard as the trial court. *Towns*, 2008 VT 98, ¶ 8. We will uphold summary judgment if there are no genuine

---

[1] The record indicates that two other policies, covering the period between July 18, 1992 and July 18, 1994, have been discovered, but these policies contain pollution exclusion clauses.

issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.*; V.R.C.P. 56(c)(3). Likewise, our review of a trial court's interpretation of an insurance contract is "plenary, and nondeferential," because such an interpretation is a question of law. *Towns*, 2008 VT 98, ¶ 8 (quotation omitted).

¶ 6. The central question here is which of the two principal methods of allocating costs and damages is appropriate given the facts of this case. The first allocation method, advocated for by the State, is joint and several liability,[2] in which "any policy on the risk for any portion of the period in which the insured sustained property damage . . . is jointly and severally obligated to respond in full, up to its policy limits, for the loss." *Towns*, 2008 VT 98, ¶ 33 (quotation omitted). Under joint and several liability as argued by the State, Stonington would be liable for all cleanup costs up to its policy limits, irrespective of when the contaminant exposure occurred, but would have the right to obtain contribution from other insurers or the owner for the period in which there is no insurance based on a time-on-the risk analysis. The second method, advocated for by Stonington, and adopted by the trial court, is the time-on-the-risk or "pro-ration by years" method in which "each triggered policy bears a share of the total damages proportionate to the number of years it was on the risk, relative to the total number of years of triggered coverage." *Id.* (quotation omitted). Under this method, Stonington is liable for only 4/27, or 15%, of the cleanup costs.

¶ 7. Specific policy language limiting coverage affects whether liability allocation should be joint and several or related to time on the risk. "Claims-made" policies generally restrict coverage to claims made during the policy period "without regard to the timing of the damage or injury." *Id.* ¶ 29 (quotation omitted). "Occurrence-based" policies, on the other hand, provide coverage only for injury or property damage "which occurs during the policy period." *Id.* ¶ 28 (quotation omitted); see also *Montrose Chem. Corp. v. Admiral Ins. Co.*, 913 P.2d 878, 892 (Cal. 1995) (holding that standard occurrence-based policy "was intended to

---

[2] As discussed *infra*, ¶ 12, the description "joint and several liability" is a misnomer when applied to insurance coverage. See *Boston Gas Co. v. Century Indem. Co.*, 910 N.E.2d 290, 301 n.24 (Mass. 2009); J. Stempel, *Domtar Baby: Misplaced Notions of Equitable Apportionment Create a Thicket of Potential Unfairness for Insurance Policyholders*, 25 Wm. Mitchell L. Rev. 769, 791 n.98 (1999).

provide coverage when damage or injury . . . occurs during the policy period"). In cases of contamination from continuing leakage of hazardous materials, courts have used the "continuous trigger" theory to find that damage from continuous exposure to contaminants during a policy period is an "occurrence" sufficient to trigger coverage under an occurrence-based policy. See *Towns*, 2008 VT 98, ¶ 6; see also *Montrose*, 913 P.2d at 894 (stating that under continuous-trigger test, "injuries and property damage that are continuous or progressively deteriorating throughout successive policy periods are covered by all policies in effect during those periods").

¶ 8. The State makes two categories of arguments: (1) *Towns* should be narrowed so it doesn't apply to commercial general liability insurance or to litigation brought by the State on behalf of the VPCF; and (2) *Towns* should not apply on the facts of this case. Before we get to the specifics of these arguments, we summarize our decision in *Towns*. *Towns* involved a property owner who, from 1972 to 1987, diverted waste and debris from his waste-hauling business to his own private property to use as fill. This fill resulted in chemical contamination, which was described in the case as generally including "an initial 'burst' of constituents lasting several months, followed by a relatively 'steady state' of contamination lasting for as long as the material remains in place." *Towns*, 2008 VT 98, ¶ 32. The litigation involved an action filed by the property owner against an insurance company that had provided him a homeowner's liability policy covering the property from November 1983 to June 1987. The property owner was self-insured from November 1972 until November 1983. *Id.* ¶ 6 n.2. As in the current case, the insurance policy at issue in *Towns* was an occurrence-based policy. *Id.* ¶ 28. We concluded that chemical contamination undoubtedly occurred during the period when the insurance policy was in effect and that the trial court properly applied a continuous-trigger test to determine whether an injury-producing occurrence took place during the policy period. *Id.* ¶¶ 31-32. Under the continuous-trigger test, any insurance carrier who insured the risk during the period from the point the property was first exposed to the migration of hazardous chemicals into the soil and groundwater to the point where the migration ceased is liable in some amount. *Id.* Thus, the "injury is deemed to have 'occurred' at each and every point of time at which there was a contributing contamination." R. Bratspies,

*Splitting the Baby: Apportioning Environmental Liability Among Triggered Insurance Policies*, 1999 BYU L. Rev. 1215, 1231 (cited in *Towns*).

¶ 9. After determining that there was an occurrence during the period of coverage by the insurance policy, we turned to how the damages caused by the contamination would be allocated. We carefully reviewed numerous commentators and jurisdictions addressing the proper method of allocating insurance coverage in such situations. *Towns*, 2008 VT 98, ¶¶ 34-35. After taking into account various policy considerations, we ultimately held that defense and indemnity costs in *Towns* were properly allocated between the property owner and the insurance company based on the percentage of each party's time on the risk. *Id.* ¶ 38. Thus, based on the total period of the exposure of approximately fourteen and a half years, and the policy period of approximately three and a half years, the decision allocated approximately 25% of the damages to the insurance carrier.[3] *Id.* ¶¶ 6, 38. We concluded that this method of allocation was the "most consistent with the continuous-trigger rule and the standard occurrence-based policy provision," *id.* ¶ 34, and that the "time-on-the-risk method offers several policy advantages, including spreading the risk to the maximum number of carriers, easily identifying each insurer's liability through a relatively simple calculation, and reducing the necessity for subsequent indemnification actions between and among the insurers," *id.* ¶ 35. We also held that "where the policyholder is self-insured for any period of time on the risk . . . it is equally fair and reasonable to hold the policyholder responsible for that portion of the total defense and indemnity costs over which he or she chose to assume the risk." *Id.* ¶ 37.

■■ ¶ 10. In its first category of arguments, focusing on the idea that *Towns* should be narrowed, the State argues that *Towns* should not apply, and joint and several liability should apply, because the policy involved here was a commercial general liability policy for a gasoline station. Because the station owner is subject to joint and several liability under 10 V.S.A. § 6615(c), and faced the risk of a hazardous waste migration, the State argues that the owner expects that the policy would impose the same joint and

---

[3] The actual allocation was done based on a count of the number of days of the exposure and the aggregate policy periods. See *Towns*, 2008 VT 98, ¶ 6 n.2.

several liability on the insurer. There are multiple difficulties with the State's argument. First, *Towns* is fundamentally based on the occurence-based language of the policy, and the language is not significantly different in the policy in this case. The State correctly notes that, because an insurer generally prepares insurance policies with little meaningful input from the insured, this Court construes insurance policy language in favor of the insured, in accordance with the insured's reasonable expectations for coverage. See *Hardwick Recycling & Salvage, Inc. v. Acadia Ins. Co.*, 2004 VT 124, ¶ 23, 177 Vt. 421, 869 A.2d 82. At the same time, however, we "will not deprive the insurer of unambiguous terms placed in the contract for its benefit." *Fireman's Fund Ins. Co. v. CNA Ins. Co.*, 2004 VT 93, ¶ 9, 177 Vt. 215, 862 A.2d 251; see also *Vt. Mut. Ins. Co. v. Parsons Hill P'ship*, 2010 VT 44, ¶ 28, 188 Vt. 80, 1 A.3d 1016 (reasonable expectations of insured cannot control over unambiguous policy language). We give insurance contracts a "practical, reasonable, and fair interpretation, consonant with the apparent object and intent of the parties, and strained or forced constructions are to be avoided." *McAlister v. Vt. Prop. & Cas. Ins. Guar. Ass'n*, 2006 VT 85, ¶ 17, 180 Vt. 203, 908 A.2d 455 (quoting *Wendell v. Union Mut. Fire Ins. Co.*, 123 Vt. 294, 297, 187 A.2d 331, 333 (1963)) (internal quotation marks omitted). Bradford's Stonington policies unambiguously state that the insurance provided "applies to 'bodily injury' and 'property damage' only if: (1) The 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory'; and (2) The 'bodily injury' or 'property damage' occurs during the policy period." The only reasonable interpretation of this policy language is that Stonington was limiting its liability to damages for occurrences that took place during the policy period.

■ ¶ 11. Further, the State has adopted a selective view of the reasonable expectations of the insured. As many courts have held, it is unreasonable to expect that an insurance policy with a specific durational limit will provide coverage for occurrences outside of that limit. The Massachusetts Supreme Judicial Court recently explained:

> Further, we doubt that an objectively reasonable insured reading the relevant policy language would expect coverage for liability from property damage occurring outside the policy period. Read as a whole, neither

> Century policy expressly makes or implies a promise to pay one hundred per cent of Boston Gas's liability for multi-year pollution damage occurring decades before or after the policy period. No reasonable policyholder could have expected that a single one-year policy would cover all losses caused by toxic industrial wastes released into the environment over the course of several decades. Any reasonable insured purchasing a series of occurrence-based policies would have understood that each policy covered it only for property damage occurring during the policy year.

*Boston Gas Co. v. Century Indem. Co.*, 910 N.E.2d 290, 309 (Mass. 2009). We do not see how this reasonable expectation is any different for an insured under a homeowner's policy than for an insured under a commercial general liability policy. In fact, virtually all the significant cases in this area have involved commercial general liability policies covering businesses with hazardous waste exposure risk. See *Pub. Serv. Co. v. Wallis & Cos.*, 986 P.2d 924, 927-28, 939-40 (Colo. 1999); *Boston Gas Co.*, 910 N.E.2d at 294; *EnergyNorth Natural Gas, Inc. v. Certain Underwriters at Lloyd's*, 934 A.2d 517, 519, 526 (N.H. 2007); *Consol. Edison Co. of N.Y., Inc. v. Allstate Ins. Co.*, 774 N.E.2d 687, 695 (N.Y. 2002).

¶ 12. Finally on this point, the State's argument is based on a supposed equivalence of the insured's joint and several liability and that of the insurer. We used the term "joint and several liability" to describe the alternative allocation rule in *Towns*, but this description only confuses the issue here. Other courts have used different descriptions, and one commentator has urged that "[c]ourts . . . refrain from describing the results they reach as having any relationship to 'joint and several' liability when, in fact, no such relationship exists." W. Hickman & M. DeYoung, *Allocation of Environmental Cleanup Liability Between Successive Insurers*, 17 N. Ky. L. Rev. 291, 315 (1990). In fact, the indemnity obligation of insurance carriers will be determined by contract language and policy limits, which may have no relationship to the duration of insurance or the amount of damages. Thus the contribution of insurers is different from the tort concept of contribution between joint tortfeasors. This difference can be further seen in the fact that even the supposed "joint and several" liability that the State seeks would allow any insurer that pays the

State's cost to seek contribution from other insurers, whereas our common law does not recognize a right of contribution between tortfeasors who are jointly and severally liable, see *Swett v. Haig's, Inc.*, 164 Vt. 1, 5, 663 A.2d 930, 931 (1995). The equivalence on which the State relies is, at best, a rough similarity that may or may not apply in the individual case.

■ ¶ 13. To summarize, the reasonable expectation of the insured, if it controls at all, is too uncertain for us to rely upon in fashioning an allocation rule for insurers. The State's reasonable expectation arguments do not persuade us to abandon *Towns* or to distinguish that decision in this case.

■ ■ ¶ 14. The State's second argument in this category is that the *Towns* allocation rule should not apply when the plaintiff is the VPCF and not the insured. By statute, the State may recover cleanup costs "to the extent covered, when there is insurance coverage." 10 V.S.A. § 1941(f). The statute authorizes the State to "seek reimbursement in instances where the land is covered by insurance, to the extent of the coverage." *Agency of Nat. Res. v. U.S. Fire Ins. Co.*, 173 Vt. 302, 307, 796 A.2d 476, 480 (2001). Consistent with the use of the term "to the extent covered," the statute does not govern how coverage will be determined. As the trial court held, the State stands in the shoes of the insured when it sues the insurer. Despite that relationship, the State is arguing that it should be able to recover more from the insurer than the insured can recover. *Towns* specifically governs the relationship between the insured and the insurer. We see no reason why it should not govern the insurance coverage available to VPCF.

¶ 15. The State makes a number of policy arguments why VPCF should be able to recover the full policy limits from any insurer irrespective of the duration of its coverage. For example, the State argues that early VPCF intervention limits the total cost of cleanup and reduces the cost for all responsible parties. It points out that VPCF is not an insurance company that can limit its liability. These arguments presuppose a different statutory scheme in which insurance coverage and the allocation of responsibility between insurers and between insurers and the insured(s) is determined specifically by statute based on the policy concerns the State asserts. In this case, the responsibility of a specific insurer is based on its insurance policy with the insured, and *Towns* governs that relationship.

¶ 16. The State's third argument falls mainly in its second category of claims — that *Towns* should not apply on the facts of this case. Specifically, the State argues that a share of the liability can be allocated to the owner, Bradford, only if it elected to self-insure during that period and Stonington failed to prove that Bradford did choose to self-insure. The State's argument is premised on its claim that Stonington had the burden of proof on allocation and that burden included showing the presence and availability of other insurance and Bradford's reasons for its actions. We cannot accept the State's argument either as to the burden of proof or as to the importance of the reasons for Bradford's actions.

¶ 17. We acknowledge that we did not comprehensively analyze these issues in *Towns* because they were not raised in that case, and the absence of this analysis enables the State's argument. In *Towns*, we said "where the policyholder is self-insured for any period of time on the risk, . . . it is equally fair and reasonable to hold the policyholder responsible for that portion of the total defense and indemnity costs over which he or she chose to assume the risk." 2008 VT 98, ¶ 37. In fact, there are multiple reasons why the evidence may show gaps in insurance coverage: (1) the landowner chose not to purchase insurance; (2) there is insurance, but the carrier is insolvent; (3) there is insurance, but the landowner cannot locate the policy or identify the insurer; (4) there is insurance, but the risk is covered by an exclusion; (5) insurance for the risk involved is unavailable. See T. Jones & J. Hurwitz, *An Introduction to Insurance Allocation Issues in Multiple-Trigger Cases*, 10 Vill. Envtl. L.J. 25, 51 n.115 (1999). In the aggregate, the period of time when there is no effective insurance is known as "orphan shares." *Id.* at 51. In general, courts that have adopted time-on-the-risk allocation have not deemed relevant why there is no effective insurance and have allocated orphan shares to the landowner. See S. Plitt & J. Rogers, *A Proportional Methodology for Determining Covered Damages Where Continuing and Progressive Injury Is Involved*, 31 Ins. Litig. Rep. 361, 370 n.31 (2009). The reason is stated in *Spartan Petroleum Co. v. Federated Mutual Insurance Co.*, 162 F.3d 805, 812 (4th Cir. 1998), a decision relied upon in *Towns*: "To hold otherwise would be to make an insurer liable for damages that occurred when it was *not* on the risk."

¶ 18. The State has relied upon a line of cases beginning with *Owens-Illinois, Inc. v. United Insurance Co.*, 650 A.2d 974 (N.J. 1994). In *Owens-Illinois*, the court adopted an allocation that melded time on the risk with policy limits and decided that no period would be allocated to the landowner where insurance was unavailable. *Id.* at 995-96. Courts following *Owens-Illinois* have held that an insurer seeking to allocate a period to the landowner bears the burden of proving that insurance was available at that time. See *Chem. Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.*, 177 F.3d 210, 231 (3d Cir. 1999). The State, by its argument, has attempted to limit *Towns* to any reason for an orphan share other than the first — intentional self-insurance where insurance extending coverage is available — and has attempted to place the burden on the insurer to prove that no other reason for lack of coverage applied.

¶ 19. We conclude that the reason for the absence of effective insurance is not determinative. The rationale for the allocation of orphan shares in *Owens-Illinois* may be consistent with its overall allocation methodology, but it is not consistent with a pure time-on-the-risk methodology. Moreover, we do not want to adopt a methodology that rewards inaction, failure to obtain appropriate coverage, or failure to keep track of insurance policies. Also, we note that in this case the State challenged a pollution exclusion in the Stonington policy and prevailed. We cannot assume that pollution exclusion provisions in other policies would be effective to prevent liability for other carriers.

¶ 20. Apart from the substance of the State's argument, we cannot accept much of its procedural argument. The State argues that allocation is an affirmative defense that Stonington must plead under V.R.C.P. 8(c), and prove under *Pharmacists Mutual Insurance Co. v. Myer*, 2010 VT 10, ¶ 14, 187 Vt. 323, 993 A.2d 413. We do not believe that allocation was an affirmative defense in this case. The State brought a cross-claim against Stonington alleging that it was liable for *all* cleanup costs. It was required to prove this claim.

¶ 21. Assignment of the burden of proof, particularly in insurance coverage cases, must often be based on practical considerations. In *State v. CNA Insurance Cos.*, 172 Vt. 318, 329-31, 779 A.2d 662, 671-72 (2001), we assigned to the insurer the burden of proof to show the absence of an occurrence that would

trigger insurance coverage. The issue was whether the pollution was intended or expected from the actions of the insured taken some fifty years earlier. We held that the insurer was in the better position to show an intent to harm the environment rather than imposing the obligation to prove the negative on the insured. *Id.* at 331, 779 A.2d at 672. As we explained in *Northern Security Insurance Co. v. Stanhope*, 2010 VT 92, ¶ 10, 188 Vt. 520, 14 A.3d 257, the holding in *CNA* is intended to avoid leaving the insured the obligation to prove a negative and to place the burden on the party with the most incentive and ability to develop the issue. The State's theory of burden allocation in this case would leave Stonington proving a negative — that Bradford did not intend to self-insure — during periods without effective insurance, including the absence of policies and the failure to obtain complete coverage. While it might have been appropriate to hold that Stonington must prove that insurance with pollution coverage was available from some source, as cases in the *Owens-Illinois* line held, we do not believe it would be appropriate to make the insurer disprove other reasons why effective insurance was not present.

¶ 22. Finally, we consider one other argument that the State failed to preserve. The State contends that, due to the equities involved here, the policies at issue should not be construed as occurrence-based policies but, rather, as essentially claims-made policies. It argues that, based on prior Vermont cases, the policies should have included a pollution coverage endorsement providing coverage on a claims-made basis[4] and that, since Stonington stipulated to coverage here, the company "effectively acknowledg[ed] that its insurance policy was not enforceable under Vermont law." We decline to reach the merits of this argument because the State failed to preserve it in the trial court. We have consistently held that matters not raised at the trial court may

---

[4] Despite the State's characterization of the pollution coverage endorsement as providing coverage on a claims-made basis, we note that the endorsement to which the State refers is actually titled "Commercial General Liability Coverage Form (Occurrence Version)," and it includes specific occurrence-based coverage language: "The insurance applies to 'bodily injury' and 'property damage' only if: (1) The 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory'; (2) The 'bodily injury' or 'property damage' occurs during the policy period." Thus, not only does the endorsement limit coverage to claims "first made against any insured . . . during the policy period," but it also appears to limit coverage by requiring that the claim relate to damage that occurred during the policy period.

not be raised for the first time on appeal. *Progressive Ins. Co. v. Brown ex rel. Brown*, 2008 VT 103, ¶ 8, 184 Vt. 388, 966 A.2d 666. Preservation requires a party to "present the issue with specificity and clarity" at the trial court in order to "ensure that the original forum is given an opportunity to rule on an issue" prior to review by this Court. *Id.* (quotations omitted). In its statement of undisputed facts, the State did mention multiple times that the general insurance policy Stonington issued to Bradford did not contain a pollution endorsement. However, the State never made any argument in the trial court about the effect that this absence might have on the characterization of Stonington's policy as either occurrence-based or claims-made. We conclude that the State's references to the pollution endorsement at the trial court were insufficient to properly preserve the pollution endorsement argument now brought on appeal — the argument was not brought before the trial court with enough clarity to allow the court to rule on it. Because the issue was not properly preserved, we decline to reach it on appeal.

¶ 23. In conclusion, although the State has argued that our decision in *Towns* can be distinguished, we conclude that this case fits squarely within the *Towns* holding. In order for the State to prevail, we would have to overrule much of the *Towns* holding. We decline to do so.

*Affirmed.*